v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 71A03–0403–JV–103.

Court of Appeals of Indiana.

Oct. 27, 2004.

Jill Ulrich, St. Joseph County Public Defender, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Daniel Jason Kopp, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

J.Y. appeals from his adjudication as a delinquent child for committing Attempted Child Molesting, as a Class B felony, and Child Molesting, as a Class C felony, when committed by an adult. He presents the following issues for our review:

1. Whether the juvenile court abused its discretion when it admitted into evidence testimony regarding the victim's out-of-court identification of J.Y.

2. Whether the State presented sufficient evidence to support his adjudication as a delinquent child.

We reverse.[1]

### FACTS AND PROCEDURAL HISTORY

On April 22, 2003, in the early evening, then eight-year-old A.B., an African-American girl, was riding her bike in the alley behind her house in South Bend when she encountered two Caucasian, teenaged boys who are brothers. One or both of the boys forced A.B. into a van parked off of the alley, shoving or dragging her through a large, broken-out window. Inside the van, the rear seat cushions were folded flat, creating a large, mattress-like area. The younger brother removed A.B.'s clothes, began to rub his penis on the outside of A.B.'s vagina, and ejaculated onto her abdomen and the van's seat cushion. During that time, the older brother was standing right outside the van. Then the younger brother exited the van, and the older brother entered the van and began rubbing his penis on the outside of A.B.'s vagina. A.B. shouted out "No!" and the boy stopped without ejaculating. A.B. then exited the van and went home.

A.B. did not tell her grandmother, her legal guardian, about the incident. But the next day at school, A.B. told her teacher what had happened. Accordingly, A.B.'s teacher took her to the principal's office, and the principal telephoned A.B.'s grandmother, Freddie Blake. A social worker assigned to the school drove A.B. home and then accompanied A.B. and Blake to the hospital for a physical examination. The physician who examined A.B. did not find any signs of sexual assault.

On April 25, 2003, A.B. underwent a videotaped interview with Angie Scott, a social worker with the CASIE Center. During that interview, A.B. reluctantly described the encounter and stated that the assailants were two Caucasian, teenaged brothers, one of whom is named Michael. A.B. did not provide either Scott or police with any additional physical characteristics to describe the boys.

Detective Cynthia Eastman of the South Bend Police Department began her investigation into the alleged sexual assault and learned that the van was owned by Tom Fairres, a Caucasian man living in a house across the alley from A.B.'s house and

---

1. We heard oral argument in this case on August 16, 2004.

whose three Caucasian, teenaged sons were living with him. Detective Eastman obtained photographs of Fairres' sons T.Y., J.Y., and C.Y. to include in a photo array for A.B.'s consideration. In addition to those three photos, which had been copied from the boys' school identification cards, Detective Eastman chose three additional photos of boys who were roughly the same ages as the suspects and who shared some of the same basic physical characteristics. In the photo array, Fairres' three sons are wearing white t-shirts, and the other three boys are wearing collared shirts and ties. Two of the other boys are also wearing blazers.

Detective Eastman showed the photo array to A.B. in the principal's office at her school. Also present were Blake and A.B.'s teacher. Detective Eastman advised A.B. that her assailants' photographs might not be in the array. After looking at the array for less than one minute, A.B. began shaking and pointed at the photographs numbered 2 and 5. Those photographs depicted J.Y. and C.Y., respectively.

The State filed a petition against J.Y. alleging his delinquency for two counts of child molesting, one as a Class B felony and one as a Class C felony when committed by an adult. At the hearing, J.Y. moved to suppress Detective Eastman's testimony regarding A.B.'s out-of-court identification of him alleging that the photo array was impermissibly suggestive. The juvenile court denied that motion. When A.B. testified, she could not identify either J.Y. or his brother, who were both sitting in the courtroom. A.B. referred to the older assailant as "Plain Old Boy," but there was no evidence showing that that was J.Y.'s nickname. A.B. used J.Y.'s first name to identify the older assailant, but did not indicate when or where she had heard his name. And, instead of pointing to J.Y. in making the identification, she pointed to someone else sitting in the back row of the gallery in the courtroom. J.Y. was sitting toward the front of the courtroom at his counsel's table. A.B. subsequently testified that neither of the assailants was present in the courtroom. At the conclusion of the hearing, the juvenile court adjudicated J.Y. a delinquent child. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Photo Array

J.Y. first contends that the juvenile court abused its discretion when it admitted into evidence Detective Eastman's testimony regarding A.B.'s out-of-court identification of him after looking at a photo array. Specifically, J.Y. maintains that the photo array was impermissibly suggestive and, as such, that the identification violated his right to due process. We must agree.

Due process of law under the Fourteenth Amendment to the United States Constitution requires suppression of testimony about a pre-trial identification when the procedure employed is unnecessarily suggestive. *Parker v. State*, 698 N.E.2d 737, 740 (Ind.1998). Otherwise, the defendant is subjected to the unacceptable risk that the identification process was conducted in such a way that it created a substantial likelihood of irreparable misidentification. *Id.* Whether the procedure employed was unnecessarily suggestive in a particular case is to be determined under the totality of the circumstances. *Id.* Our supreme court has held that a photo array is *not* impermissibly suggestive if the defendant "does not stand out so strikingly in his characteristics that he virtually is alone with respect to identifying features." *Farrell v. State*, 622 N.E.2d 488, 494 (Ind.1993).

Factors to be considered in evaluating the likelihood of a misidentification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; and (4) the level of certainty demonstrated by the witness. *Parker*, 698 N.E.2d at 740. Among other factors the court may consider are: (1) the manner and form in which the police asked the witness to identify the suspect and the witness's interpretation of their directives; and (2) whether the police focused on the defendant as the prime suspect, either by their attitude or the makeup of the photo array. *Id.*

In this case, the photo array consists of black-and-white copies of six photographs. T.Y. and J.Y. are depicted in the photographs numbered one and two, respectively. Each of them is wearing a white t-shirt, and each has dark, short hair. The photographs are candid shots; the boys are not posed, the lighting is such that the boys' faces are mostly in shadow, and the darkness of their faces is exacerbated by the use of all-white backgrounds. Neither boy is smiling in the photographs. The photographs of T.Y. and J.Y. are almost indistinguishable, although they are not twins.

The boys depicted in photographs numbered three, four, and six are in the same age group as J.Y. and C.Y. But those photos are school portraits; the boys are posed, and the lighting is such that the boy's face in number three is almost completely illuminated, and the boys' faces in numbers four and six are mostly illuminated. The backgrounds in each of the photos are dark. Those boys are wearing collared shirts with ties, and two of them are wearing blazers. All three boys have dark, short hair, although one of the boys

has blonde highlights. Also, all of the boys are smiling.

Finally, in his photograph, C.Y. is wearing a white t-shirt, but, unlike the photographs of T.Y. and J.Y., the photograph appears to be a school portrait. The background consists of light and dark contours. While the lighting on his face is better than that in his brothers' photographs, it is not as good as the lighting on the other boys' faces. The quality of the copy is poor, which gives C.Y.'s face a dark, grainy appearance. C.Y. displays what might be considered a smile; while his teeth are showing, the ends of his mouth are not drawn upward.

Our review of relevant Indiana case law reveals no reported case where our courts have held that a photo array was impermissibly suggestive. J.Y. attempts to distinguish his case from our supreme court's opinions in *Harris v. State*, 716 N.E.2d 406 (Ind.1999), and *Farrell v. State*, 622 N.E.2d 488 (Ind.1993). In *Harris*, the defendant asserted on appeal that the photo array at issue was impermissibly suggestive "because (1) he was the sole person depicted in the array wearing a white shirt, and (2) only he and one other person are depicted in the array with hairstyles that resemble dreadlocks." 716 N.E.2d at 410. Our supreme court addressed the issue as follows:

> A review of the photographs at issue discloses that each of the photographs depicted young African–American men who shared similar physical characteristics. *Defendant's photograph is not distinguishable from the others by virtue of his clothing or hair style nor are any of his physical characteristics uniquely distinguishable from those of the other men depicted in the array.* Further, [the victim] reported to police officials that Defendant wore a black jacket at the time of the crime. Defendant's ap-

pearance in the photo array wearing a white shirt suggests that [the victim] identified Defendant without relying on clothing. With respect to hairstyles, all of the men depicted in the array had some form of braids or "dreadlocks." Although the hairstyles were dissimilar in length, a photographic array is sufficient if the defendant "does not stand out so strikingly in his characteristics that he virtually is alone with respect to identifying features." Defendant did not stand out.

Given the totality of the circumstances, including [the victim's] description of Defendant and his level of certainty in identifying Defendant, we find the record demonstrates that the photographic array was not impermissibly suggestive.

*Id.* (citations and footnotes omitted, emphasis added).

In *Farrell,* the defendant asserted on appeal that "the pre-trial identification procedure was so unduly suggestive that it tainted the victim's in-court identification." 622 N.E.2d at 493. Our supreme court held as follows:

We address first the photographic array. One day after the crime, [the victim] was shown facial color photographs of three males. She selected Farrell's as the perpetrator. Farrell complains that this procedure was flawed because (1) [the victim] was told by a detective that it was possible that the suspect might be in the photographic array; (2) the array should have included more than three photographs; and (3) the two other photographs were not similar enough to his own.

Indiana courts have recommended that photo arrays consist of at least five or six individuals. Depending upon the surrounding circumstances, however, an array of fewer than five does not render the testimony regarding the identifica-

tion inadmissible per se. In the present case, police officers testified that they included only three photographs in the array because they were unable to find more than two other individuals sufficiently resembling the defendant. Each of the three photographs showed a white male having dark eyes, moderate hair length, and no facial hair. The victim herself testified that the photographs depicted individuals having a similar appearance. *We do not perceive that the fact that Farrell wore a dark t-shirt or had a hair style slightly different from the others resulted in an impermissibly suggestive array.* There is no requirement that law enforcement officers "perform the improbable if not impossible task of finding four or five other people who are virtual twins to the defendant." It is sufficient if the defendant "does not stand out so strikingly in his characteristics that he virtually is alone with respect to identifying features."

[The victim] had sufficient opportunity to view the perpetrator at the time of the crime. She testified that it was not difficult for her to see his face and she had the opportunity to view him at close range under good lighting conditions. *She provided police with a detailed description of his appearance which was consistent throughout.* Upon selecting his photograph from the array, she indicated she was one hundred percent certain that he was the perpetrator. Under these circumstances, we do not perceive that the photo array was unduly suggestive.

Under the totality of the circumstances, we conclude that the pre-trial lineup was not impermissibly suggestive, and this evidence was properly admitted.

*Id.* at 494 (citations omitted, emphases added).

We agree with J.Y. that this case is distinguishable from *Harris* and *Farrell.* In both of those cases, the court noted only slight differences in the defendants' physical appearances compared to the other men in the photo arrays. But here, there are essentially two sets of photographs in the array. One set consists of J.Y. and his two brothers, each wearing a white t-shirt, with T.Y. and J.Y. looking exactly alike, not smiling, with faces in shadow, and with white backgrounds. The other set of photographs consists of the other three boys, who are all posed, smiling, and wearing dress clothes. A.B. never described what the perpetrators were wearing at the time of the attack. Given her young age, A.B. might well be inclined to believe that the boys wearing dress clothes and smiling were not her attackers. As a whole, the remarkable differences in appearance between J.Y. and his brothers and the other three boys, including their clothing and demeanor, and the difference in the quality and composition of the two sets of photographs, render the photo array impermissibly suggestive.

■ We are mindful of our supreme court's holding in *Farrell,* 622 N.E.2d at 494, that a photo array is not impermissibly suggestive if the defendant "does not stand out so strikingly in his characteristics that he virtually is alone with respect to identifying features." In applying that test here, under these unique circumstances, we think that the photo array is impermissibly suggestive in that the defendant and his two brothers are all suspects and their physical characteristics, dress, and demeanor stand out so strikingly when compared with those of the three other individuals in the array.[2] In other words, while J.Y. does not stand out virtually alone when compared with his two brothers, J.Y. and his brothers stand out "strikingly" in their characteristics when compared with the other three boys. Thus, the array creates the prohibited result delineated in *Farrell,* namely, "a substantial likelihood of irreparable misidentification." *Id.* at 493.

■ In addition to the content of the photo array, the totality of the circumstances indicates a reasonable likelihood of misidentification in this case. *See Parker,* 698 N.E.2d at 740. There is scant evidence of how dark or light it was both inside and outside the van at the time of the attack. *See id.* During her videotaped interview, A.B. stated only that it was "getting dark" outside. State's Exhibit B. A photograph taken of the inside of the van shows what appear to be curtains capable of covering some of the van's windows. State's Exhibit F. More importantly, A.B.'s inability to describe her assailants' height, weight, attire, hair color, or facial features following the assault supports a reasonable inference that either they were not discernible or that she was not paying close attention to the perpetrators' identities. *See Parker,* 698 N.E.2d at 740. A.B. was able to state only that her assailants were two "white boys" who were brothers and that one of them was named Michael.[3]

Detective Eastman testified during voir dire that A.B. studied the photo array

---

**2.** Indiana courts have recommended that photo arrays consist of at least five or six individuals. *Farrell,* 622 N.E.2d at 494. Thus, where, as here, two suspects are included in the same array, the recommended total number of photos would be ten or twelve. An array containing fewer than the recommended number does not render the testimony regarding the identification inadmissible per se. *Id.*

**3.** Nothing in the record indicates any connection between the name Michael and any of the suspects in this case.

"intently" and that A.B. "visibly started shaking" and pointed to the photographs numbered two and five, one right after the other, in "less than a minute." Transcript at 331–32. Detective Eastman also testified that, prior to showing A.B. the photo array, she admonished A.B. that the suspects might not be included in the array. She further instructed A.B. to disregard the subjects' clothing and to be aware that hairstyles can change. Finally, Detective Eastman told A.B., "don't feel bad if you don't recognize the person that did this, because he might not be here." *Id.* at 314. In short, there is no evidence that anyone influenced A.B. in picking out J.Y. from the photo array. But J.Y. maintains that when A.B. looked at the photo array, she was likely "eager to please the authority figures present, her [grand]mother, teacher and police officer." Brief of Appellant at 12.

Regardless, under the totality of the circumstances, we conclude that J.Y. was denied his right to due process. The photo array was impermissibly suggestive; A.B. was unable to describe her assailants with any specificity; A.B. used the wrong name to identify C.Y.; A.B. could not identify J.Y. during the final hearing; and A.B. testified that neither assailant was in the courtroom. Thus, the only evidence implicating J.Y. is A.B.'s identification based upon the photo array. *Cf., Harris,* 716 N.E.2d at 411 (noting victim made in-court identification of defendant); *Farrell,* 622 N.E.2d at 494 (noting victim's "detailed description" of perpetrator was consistent before and after looking at photo array and victim made in-court identification of defendant). There is no corroborating, substantial evidence of probative value regarding identity. The juvenile court abused its discretion when it permitted A.B.'s out-of-court identification of J.Y. into evidence.

## Issue Two: Sufficiency of the Evidence

J.Y. next contends that the State presented insufficient evidence to support his adjudication as a delinquent child. When presented with a challenge to the sufficiency of the evidence upon review of a juvenile adjudication, this court will consider only the evidence and reasonable inferences supporting the judgment. *J.B. v. State,* 748 N.E.2d 914, 916 (Ind.Ct.App. 2001). We will neither reweigh the evidence nor judge witness credibility. *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt, we will affirm the adjudication. *Id.*

J.Y. maintains that without A.B.'s out-of-court identification, the evidence is insufficient to support his adjudication as a delinquent child because that was the only evidence connecting him to the offense. The State responds that A.B. identified J.Y. by his first name during direct examination. The transcript shows that A.B. did use J.Y.'s first name once during the hearing, but she stated that she was referring to someone sitting in the back row of the gallery, while J.Y. was sitting at his counsel's table toward the front of the courtroom. A.B. then testified that neither of her assailants was present in the courtroom. As such, A.B.'s single reference to J.Y.'s first name, without more, is insufficient to support his adjudication as a delinquent child.

The State also points out that J.Y. is C.Y.'s older brother, which is consistent with A.B.'s testimony that her assailants were brothers, and C.Y.'s DNA was found at the scene. Again, A.B. testified that the younger brother ejaculated during the assault, but the older brother did not. However, J.Y. is not C.Y.'s only older brother. Thus, the DNA evidence only supports a reasonable inference that J.Y. could have

been one of two boys who might have committed the offense.[4] We conclude that there is not substantial evidence of probative value from which a reasonable trier of fact could conclude that J.Y. sexually assaulted A.B. We reverse the juvenile court's adjudication of J.Y. as a delinquent child.

Reversed.

KIRSCH, C.J., and RILEY, J., concur.

4. In addition, A.B. testified that the assailants lived in the house where J.Y. and C.Y. live. But, again, that evidence only supports a reasonable inference that either J.Y. or T.Y., C.Y.'s two older brothers, committed the offense. The evidence is insufficient to establish that J.Y. was the perpetrator.