# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JEFFREY E. KIMMELL**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPORLARICH**
Deputy Attorney General
Indianapolis, Indiana

FILED

Apr 25 2013, 9:26 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARTIN MEEHAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A04-1209-CR-453 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable John M. Marnocha, Judge
Cause No. 71D02-1112-FC-286

**April 25, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Martin Meehan was convicted of burglary and being a habitual offender. The only evidence tying Meehan to the crime was a glove found at the crime scene that contained his DNA. On appeal, Meehan argues that there was insufficient evidence that he was the perpetrator, that the trial court erred by allowing the State to file an untimely habitual offender charge, and that the trial court erred by ordering his sentence to be served consecutively to another sentence with a habitual offender enhancement. Because there was no evidence that would support an inference that Meehan's DNA was found on the glove because he handled it during the burglary, as opposed to some other time, we conclude that the burglary verdict was based on speculation and must be reversed. Because we are reversing the underlying conviction, we do not reach the issues that Meehan raises regarding the habitual offender enhancement.

**Facts and Procedural History**

Scott Floyd is the shop foreman at O.J.S. Building Services in South Bend. He is responsible for opening the shop in the morning and locking up at the end of the day. On May 2, 2011, everything was in order when Floyd locked up for the day. When he arrived the next morning, he discovered that a panel of an overhead door had been damaged and removed. When he went inside, he found that two interior doors had been kicked open.

Floyd called the police, and Officer Kevin Gibbons was dispatched to the scene. After Officer Gibbons secured the scene and determined that the perpetrator was not present, an employee accompanied Officer Gibbons through the building to help identify missing items

2

and potential evidence. Missing items included laptops, computer bags, a jacket, and money. An evidence technician, Christopher Krueger, collected a glove that was found near the overhead door where the perpetrator had gained access. Floyd indicated that he had not seen the glove the day before. Krueger also collected a screwdriver that was found in an office and did not belong to the person who worked in that office. Krueger dusted for fingerprints but did not find any of value. He noticed a footprint on one of the interior doors that had been kicked in and "used an electrostatic dust lifter to lift the footwear print on Mylar paper." Tr. at 151.

The glove and the screwdriver were sent to the Indiana State Police Laboratory. The screwdriver was swabbed, but that item "failed to demonstrate a sufficient quantity of DNA for further analysis." *Id* at 232. The serologist who examined the glove noticed a stained area, which tested positive for amylase, a component of saliva. After taking a cutting of the stained area, the serologist turned the glove inside out and swabbed it. A forensic biologist, Linda Wiegman, then conducted DNA testing on the cutting and the swab. Testing of both items revealed a single DNA profile for an unknown male. Wiegman entered the profile into a database and determined that it matched Meehan.

Based on this information, police began searching for Meehan. He was arrested on December 7, 2011. Meehan was interviewed, and he denied involvement in the burglary. The police obtained a buccal swab from Meehan, which matched the DNA found on the glove. Police did not attempt to match the footprint recovered from the scene to any of Meehan's footwear. The record does not reflect that any of the stolen items were recovered.

3

Meehan was charged with class C felony burglary, and the State later added a second count that alleged that Meehan was a habitual offender.

At trial, the primary focus was on the glove, which was the only evidence that tied Meehan to the crime. Wiegman testified that the DNA recovered from the glove was all from a single source and that it was a match to Meehan's DNA profile. Wiegman indicated that there is no way to tell when the DNA was deposited on the glove and that there is no "set time on how long DNA is good." *Id.* at 259.

The jury found Meehan guilty of burglary. Meehan waived his right to a jury trial on the habitual offender count, and the trial court found him to be a habitual offender. The trial court sentenced Meehan to five years for burglary plus an eight-year habitual offender enhancement. The court ordered the sentence to be served consecutively to a sentence imposed in a previous case. Meehan now appeals.

## Discussion and Decision

Meehan raises three issues, one of which we find dispositive: whether there was sufficient evidence to support his burglary conviction. We conclude that there is not.

Our standard of review for a sufficiency of the evidence claim is well settled:

> When reviewing the sufficiency of evidence supporting a conviction, we will not reweigh the evidence or judge the credibility of witnesses. We must look to the evidence most favorable to the conviction together with all reasonable inferences to be drawn from that evidence. We will affirm a conviction if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.

*Stewart v. State*, 866 N.E.2d 858, 862 (Ind. Ct. App. 2007) (citations omitted).

4

The parties both agree that there is no case determining whether the presence of the defendant's DNA on an object left at the crime scene, standing alone, is sufficient to prove that the defendant committed the offense. In formulating their arguments, the parties discuss two related cases, *C.L.Y. v. State*, 816 N.E.2d 894 (Ind. Ct. App. 2004), *trans. denied* (2005), and *J.Y. v. State*, 816 N.E.2d 909 (Ind. Ct. App. 2004), *trans. denied* (2005). C.L.Y. and J.Y. were brothers who were accused of molesting an eight-year-old girl, A.B. A.B. claimed that two teenaged brothers forced her into a van. The younger brother took off her clothes and rubbed his penis against her vagina, and he ejaculated onto her abdomen and the seat cushion. The younger brother exited the van, and the older brother began rubbing his penis against her vagina. A.B. shouted, "No!" and the boy stopped without ejaculating. *J.Y.*, 816 N.E.2d at 911.

During an interview, A.B. described the boys as Caucasian, teenage brothers, one of whom she thought was named Michael. The police determined that three Caucasian, teenage brothers – T.Y., J.Y., and C.L.Y. – lived in the house behind which the van was parked. The police compiled a photo array consisting of six pictures, three of which were photos of the brothers. A.B. identified J.Y. and C.L.Y. from the array. The police also located two semen stains in the van. DNA testing revealed that C.L.Y. was the source of the semen.

The State alleged that J.Y. and C.L.Y. were delinquent for committing child molesting and attempted child molesting. At the factfinding hearings, A.B. was not able to identify J.Y. or C.L.Y. as her assailants. She was able to testify that they live in a green house, and she identified a photograph of their house.

5

J.Y. and C.L.Y. were both adjudicated delinquent. In J.Y.'s appeal, we concluded that the photo array was impermissibly suggestive and that the remaining evidence was insufficient to prove that he was one of the perpetrators. *Id*. at 916-17. In C.L.Y.'s appeal, we determined that even if the photo array was not considered, the evidence was sufficient to prove that C.L.Y. was one of the perpetrators. *C.L.Y.*, 816 N.E.2d at 904. We noted A.B.'s description of the perpetrators and their house, along with the presence of C.L.Y.'s semen in the van. *Id*.

*C.L.Y.* is easily distinguishable. While it was theoretically possible that C.L.Y.'s semen could have been deposited in the van at some other point in time, A.B. testified that one of the perpetrators ejaculated onto the seat cushion. Thus, her eyewitness testimony provided a basis for the trier of fact to determine that C.L.Y.'s semen was deposited in the van during the offense.

In this case, there was no testimony that would explain when or how Meehan's DNA came to be on the glove. As Meehan notes, a glove is "an item easily lost, found, borrowed or stolen." Appellant's Br. at 8. Meehan also argues that he "could have very easily transferred his DNA to another person's glove at some point prior to the burglary by a casual touching." *Id* at 9. The State's own expert testimony reflects that Meehan's arguments are plausible. Wiegman, the DNA analyst, testified that there was no way to determine when Meehan's DNA was deposited on the glove. Defense counsel posed the following hypothetical:

> Q.     If I were to rub a Kleenex across the palm of my hand, would that give sufficient material to be DNA tested?

6

A.    It would depend on how many cells you shed, how easily you shed cells. Obviously it would have to be cut and swabbed and extracted to determine if there is enough there. But every person is different, so it depends on how easily you shed.

Tr. at 268-69. While the State emphasizes the fact that Meehan's DNA was the only DNA found on the glove, Wiegman's response to this hypothetical indicates that it is possible that another person could have touched the glove without leaving identifiable DNA.

The State also relies on several cases in which fingerprints were the key piece of evidence: *Kenney v. State*, 908 N.E.2d 350 (Ind. Ct. App. 2009), *trans. denied*; *Mediate v. State*, 498 N.E.2d 391 (Ind. 1986); and *Evans v. State*, 495 N.E.2d 739 (Ind. 1986). In *Kenney*, Jason Noyd and Joseph Price drove to a gas station to sell marijuana to Dejuan Sampson. Sampson entered Noyd's car, and while they were discussing the drug deal, another man approached and attempted to enter the car on the rear passenger side, but the door was locked. Sampson unlocked the door, and Sampson and the unknown man robbed Noyd and Price at gunpoint. Noyd was shot and killed. Price described the unknown man as "a light-skinned African American male with short hair between the ages of twenty-five and thirty, weighing approximately 175 pounds, standing approximately five feet seven inches to five feet eight inches in height, and wearing an orange or yellow orange shirt." *Kenney*, 908 N.E.2d at 351 (internal quotation omitted). Police found Kenney's palm print on the outside of Noyd's car on the passenger side above the rear door. Kenney was ultimately convicted of felony murder.

On appeal, Kenney argued that there was insufficient evidence that he was the perpetrator. Specifically, Kenney argued that the outside of Noyd's car was publicly

7

accessible and that he could have touched it at some other point in time. However, we noted Price's testimony that the perpetrator touched the rear passenger door, and we concluded that the "unexplained appearance of Kenney's prints on an object touched during the commission of the crime raises an inference that he left them there during the commission of the crime, despite the public's access to the object." *Id.* at 353. We also noted that he fit Price's description of the perpetrator and was known to associate with Sampson.

Similar to *C.L.Y.*, it was theoretically possible that Kenney could have come into contact with the vehicle at some other point in time. However, eyewitness testimony provided a basis for the factfinder to conclude that Kenney touched the car during the offense. In addition, the witness was able to give a fairly detailed description of the perpetrator, which fit Kenney closely. In this case, no one witnessed the burglary, so there is no description of the perpetrator nor any testimony that tends to show that Meehan handled the glove during the burglary.

In *Mediate*, someone broke into Joseph Montgomery's home while he was away and took several items. Montgomery noticed that a box of shotgun shells had been moved from a closet to the garage. Police found fingerprints on the box that matched Mediate's. Montgomery was a gun dealer, and he did not know whether Mediate had ever been a customer in his store. When asked whether that particular box of shells had ever been offered for sale at his store, Montgomery testified, "Not that I know of." *Mediate*, 498 N.E.2d at 393.

Mediate was convicted of burglary and theft. On appeal, he argued that there was

8

insufficient evidence that he was the perpetrator. Our supreme court acknowledged that the box of shells may have been previously accessible to the public, but noted Montgomery's testimony that he did not believe that that particular box had been offered for sale in his store. Furthermore, it was clear that the box was handled during the burglary, which strongly suggested that the prints belonged to the perpetrator. *Id*. at 395. Therefore, our supreme court affirmed Mediate's convictions. *Id*.

In *Mediate*, the victim's testimony indicated that it was unlikely that Mediate had handled the box of shells prior to the burglary, and the fact that the box was moved indicated that it was handled during the burglary. This evidence gave rise to a reasonable inference that Mediate's prints were on the box because he touched it during the burglary. In this case, there is no evidence that would tend to suggest that it is unlikely that Meehan touched the glove at some point prior to the burglary.

Finally, the *Evans* case also concerned a burglary. The perpetrator gained access to a home by breaking a basement window. Evans's fingerprints were found on broken glass from the window, but police could not determine whether they were on the inside or outside of the glass. Evans was convicted of burglary and theft. On appeal, he argued that the evidence was insufficient because it was unclear whether his prints were on the inside or outside of the glass, and he therefore could have touched the outside of the window at some other point in time. Our supreme court held that the evidence was sufficient, emphasizing the fact that the prints were found at the point of entry. *Evans*, 495 N.E.2d at 741.

Although *Evans* was based on a smaller quantum of evidence than the other cases discussed, it is also distinguishable from the present case. The presence of Evans's fingerprints on the glass was compelling evidence that he had been present at the home at some point in time. The *Evans* court was perhaps influenced by the fact that people do not ordinarily approach a stranger's house and touch the basement windows, which makes an innocent explanation for the presence of Evans's prints seem unlikely. In this case, the presence of Meehan's DNA on a glove, an object that is easily movable and transferrable, does not necessarily indicate that Meehan was present at the crime scene. As discussed above, there are any number of reasonable explanations for how a person could come into contact with another person's glove.

In sum, in all the cases discussed, there was eyewitness or circumstantial evidence that explained how the DNA or fingerprint evidence ended up at the crime scene. In these cases, the totality of the circumstances made it unlikely that there was an innocent explanation for the presence of the DNA or fingerprint evidence at the scene.

In many cases, DNA is compelling evidence of identity. In this case, however, there was no evidence that would support an inference that Meehan's DNA was found on the glove because he handled it during the burglary, as opposed to some other time. Therefore, the guilty verdict was based on speculation and must be reversed. As our supreme court has said, a conviction "may not be based on guess or speculation." *Smith v. State*, 256 Ind. 546, 551, 270 N.E.2d 743, 745 (1971). Were we to affirm, we would be creating a precedent that would make it relatively easy for criminals to frame other individuals; all they would need to

do is obtain an object with someone else's DNA and leave it at the crime scene.  We reverse

Meehan's conviction for burglary and the resulting habitual offender enhancement.

     Reversed.

KIRSCH, J., and MATHIAS, J., concur.