Kevin L. HANCOCK, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 79A04–9912–CR–523.

Court of Appeals of Indiana.

Oct. 23, 2000.

J. Michael Trueblood, Trueblood & Graham, Lafayette, Indiana, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAILEY, Judge

### Case Summary

Defendant–Appellant Kevin L. Hancock ("Hancock") appeals following his conviction for Theft of a Motor Vehicle, a class D felony;[1] two counts of Theft as class D felonies,[2] and Theft of a Motor Vehicle While Having a Prior Conviction for Auto Theft, a class C felony.[3] Hancock further

---

1. *See* Ind.Code § 35–43–4–2.5(b).

2. *See* Ind.Code § 35–43–4–2.

3. *See* Ind.Code § 35–43–4–2.5(b).

appeals from his adjudication as an Habitual Offender.[4] We affirm.

### Issues

Hancock presents two issues for our review, which we restate as follows:

I. Whether the trial court erred when it declined to give Hancock's tendered jury instruction during the habitual offender phase of the trial.

II. Whether the deputy prosecuting attorney's comments during closing argument amounted to an inappropriate statement on Hancock's failure to testify.

### Facts and Procedural History

On the morning of May 14, 1999, Robert Van Ostran, owner of Van's Body Shop, arrived at his business in Lafayette to find broken glass at the entrance to his office door. Upon closer inspection, he found that a window had been broken from the outside. Van Ostran immediately called the police and his nephew and part-owner of the business, Brad Van Ostran. Brad Van Ostran arrived at the shop shortly thereafter and discovered that tools and toolboxes, as well as a Cadillac that he had been working on were missing. Brad also noticed that the latch on the overhead door had been torched with a gas torch.

At the time of the offense, Wendy Mae Klinger was Hancock's girlfriend, and the two shared an apartment. On May 13, 1999, Robert Conrad, Hancock's co-defendant at trial, came to Klinger and Hancock's apartment. At some point during the evening, Hancock and Conrad left the apartment. Subsequently, Klinger went to bed. Hancock and Conrad returned to the apartment after midnight with tools, a car and two other men. When Klinger heard Hancock get home, she came downstairs and observed he and Conrad unloading tools into the apartment. Klinger also observed a two-door "tannish" car. Klinger saw a large red toolbox, a small red toolbox and a bag of tools inside the car. At

approximately four a.m., Conrad and Hancock left in the car.

Mark Pearson lived in the apartment downstairs from Klinger and Hancock. When Klinger arrived home from work the following afternoon and found that Hancock was not there, she went downstairs to Pearson's apartment to ask if he had seen Hancock. Pearson then accompanied Klinger back to her apartment and observed the stolen tools. Pearson became suspicious and called the police.

Thomas Maxson, police officer with the Lafayette Police Department, received Pearson's call regarding the stolen property. When Officer Maxson arrived at Hancock and Klinger's apartment, Klinger permitted him into the apartment. Once inside, Officer Maxson observed various toolboxes and a large amount of tools. Determining the property to be stolen, Officer Maxson called for additional detectives. Detective Johnson and Detective Davis arrived at the scene and photographed the evidence. The evidence was then removed from the apartment and taken to police headquarters and placed in the evidence storage area. Meanwhile, Hancock and Conrad were arrested in Indianapolis with the stolen Cadillac.

Officer Maxson recalled that at roll call that afternoon, the officers had been advised of a robbery at Van's Body Shop. They were also advised that the car had already been recovered and Hancock and Conrad had been placed under arrest. Officer Maxson recognized the names of the arrestees, because he had stopped Hancock and Conrad at 10:50 p.m. in the vicinity of Van's Body Shop the night of the burglary. Hancock's fingerprints were found in the stolen car. Brad Van Ostran later identified the tools recovered from Hancock's apartment as the tools stolen from his business.

On May 18, 1999, Hancock was charged in a six count Information with Burglary, Theft of a Motor Vehicle, two counts of

4. *See* Ind.Code § 35–50–2–8.

Theft, being an Habitual Offender, and Theft of a Motor Vehicle While Having a Prior Conviction for Auto Theft. The Informations were amended several times, and on September 16, 1999, the State filed the additional charges of Receiving a Stolen Motor Vehicle, two counts of Receiving Stolen Property and Receiving a Stolen Motor Vehicle While Having a Prior Conviction. Hancock and his co-defendant were tried jointly to a jury on counts I through IV. At the close of the State's case-in-chief, the court granted Hancock's motion for a directed verdict on the Burglary charge. On September 22, 1999, Hancock was found guilty by a jury of Theft of a Motor Vehicle and two counts of Theft.

The court then proceeded to phase two of the bifurcated trial on the Habitual Offender and Theft of an Automobile While Having a Prior Conviction for Motor Vehicle Theft charges. The jury returned guilty verdicts on both of these charges as well. With regard to the Habitual Offender charge, the jury found that Hancock was a habitual offender and that he had prior convictions for Burglary, Attempted Arson, Auto Theft, and Operating While Intoxicated.

The court sentenced Hancock to three years on count III, Theft, and eight years on Count VI, Theft of a Motor Vehicle While Having a Prior Conviction for Auto Theft. These sentences were ordered to run concurrently and were enhanced by ten years due to the Habitual Offender finding. Hence, Hancock received an aggregate sentence of 18 years. He now appeals.

### Discussion and Decision

### I. Tendered Jury Instruction

#### A. Standard of Review

 Instructing the jury lies within the sole discretion of the trial court. *Edgecomb v. State*, 673 N.E.2d 1185, 1196 (Ind.1996). When reviewing the propriety of the trial court's decision to refuse a tendered instruction, this court must con-

sider the following: 1) whether the instruction is supported by the evidence in the record; 2) whether the instruction correctly states the law; and 3) whether other instructions adequately cover the substance of the denied instruction. *Hanson v. State*, 704 N.E.2d 152, 156 (Ind.Ct.App. 1999). Jury instructions are to be considered as a whole and in reference to each other; error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case. *Edgecomb*, 673 N.E.2d at 1196. Before a defendant is entitled to a reversal, he must affirmatively show that the instructional error prejudiced his substantial rights. *Hollowell v. State*, 707 N.E.2d 1014, 1023 (Ind.Ct.App.1999).

#### B. Analysis

Hancock contends that the trial court erred when it refused to read his tendered jury instruction during the habitual offender phase. During the habitual offender phase of the trial, Hancock tendered the following final jury instruction:

The jury is instructed that you may find that the defendant is not a habitual offender even if you find that the State has proven beyond a reasonable doubt that that defendant has accumulated two prior unrelated felony convictions.

(R. 105.) The trial court declined to give this instruction, stating that the court's instruction 1.04 covered the issue. The court's instruction 1.04 provided as follows:

You are the exclusive and sole judges of what facts have been proven and you may also determine the law for yourselves. This statement does not mean that you have the right to disregard the law or to set it aside and make your own law. You should determine the law as it is enacted by the legislature of this state and considered and interpreted by the higher courts of record, and in that way you have the right to determine the law

for yourselves, but not to make your own laws.

(R. 151.)

The thrust of Hancock's argument is that the jury was not sufficiently apprised of its role to determine the law as well as the facts. More pointedly, Hancock contends that the jury should have been specifically instructed that a habitual offender finding is not automatic upon the finding of two prior unrelated felonies. Hancock's proposed instruction would have informed the jury of its power to nullify under Article I, § 19 of the Indiana Constitution, which provides that, "in all criminal cases whatever, the jury shall have the right to determine the law and the facts."

In *Seay v. State*, the Indiana Supreme Court definitively established that the dictates of Article I, § 19 are applicable during habitual offender proceedings, and thus the jury has the power to determine both the law and the facts in such circumstances. 698 N.E.2d 732, 736 (Ind.1998). During the habitual offender phase of the trial in *Seay,* the court instructed the jury that it was the judge only of the facts, and not the law. Seay sought post-conviction relief alleging that the court's instruction was contrary to Article I, § 19 of the Indiana Constitution. The court agreed with Seay and held that the jury in a habitual offender proceeding is permitted to render a verdict that the defendant is not a habitual offender even when it finds that the State has proven beyond a reasonable doubt that the defendant has accumulated two prior unrelated felonies.[5] *Id.* at 736. In other words, the jury is entitled to make a determination of habitual offender status as a matter of law independent of its factual determination regarding prior unrelated felonies. The *Seay* court explicitly adopted the principles enunciated in Justice Dickson's separate opinion in *Duff v. State,* 508 N.E.2d 17 (Ind.1987), wherein Justice Dickson stated

In a habitual offender proceeding, the jury must not only determine whether the defendant has been twice previously convicted of unrelated crimes, but it must further determine whether such two convictions, when considered along with the defendant's guilt of the charged crime, lead them to find that the defendant is a habitual criminal.

*Seay,* 698 N.E.2d at 736 (quoting *Duff,* 508 N.E.2d at 23 (Dickson, J., separate opinion)). In adopting this rationale, the *Seay* court reasoned that "if the legislature had intended an automatic determination of habitual offender status upon the finding of two unrelated felonies, there would be no need for a jury trial on the status determination." *Seay,* 698 N.E.2d at 736.

In *Parker v. State,* following the dictates of *Seay,* the Indiana Supreme Court found that the trial court's instruction directing the jury to determine the defendant to be a habitual offender upon finding that the State properly proved two prior felonies impermissibly impinged upon the jury's role under Article I, § 19 to determine the law as well as the facts. 698 N.E.2d 737, 743 (Ind.1998). The defendant in *Parker* acknowledged and the court agreed that reversible error does not necessarily result when the type of instruction provided in this case is accompanied by other instructions informing the jury of its role as judge of law and facts. The court in *Parker* gave two instructions that informed the jury that it was the judge of the law and the facts. These instructions were given as preliminary instructions at the beginning of the guilt phase and were sent in with the jury during its guilt phase deliberations. However, it was not until two weeks after the jury had rendered its verdict in the guilt phase that the jury reconvened for the habitual offender phase. The defendant argued and the court agreed that the two-week delay between the guilt phase and the habitual offender

---

5. Although the court agreed with Seay's argument, post-conviction relief was ultimately denied.

phase rendered the preliminary instructions inadequate to compensate for the erroneous instruction which impinged upon the jury's prerogative to determine the law and the facts. *Id.* at 743. Furthermore, the court not only rejected the defendant's request to substitute may for should in the instruction at issue, but also overruled the defendant's request to instruct the jury that it was the judge of the law as well as the facts. *Id.*

In a very recent opinion of the Indiana Supreme Court, the court held that when a defendant requests the trial court to instruct the jury on its role as finders of law and fact during the habitual offender phase of a trial, it is reversible error for the trial court to refuse the request. *Warren v. State,* 725 N.E.2d 828, 837 (Ind. 2000). In *Warren,* the court instructed the jury in its preliminary instructions that it was the finder of fact and law. However, the court's final instructions during the guilt phase did not include such an instruction. The defendant was found guilty, and prior to the habitual offender phase of the trial he tendered the following instruction:

> Under the Constitution of Indiana, the jury is given the right to decide both the law and the facts. Fulfilling this duty, you are to apply the law as you actually find it and you are not to disregard it for any reason. The instructions of the court are your best source for determining what the law is.... You are the exclusive and sole judges of what facts have been proven and you may also determine the law for yourselves, but [you are] not to make your own laws.

*Warren,* 725 N.E.2d at 835–36. The trial court refused to give this instruction, stating that its preliminary instruction before the guilt phase of the trial adequately covered the jury's role as finders of both law and fact. The record indicated that the guilt phase instructions and the habitual phase instructions were sent into the jury room during their habitual phase deliberations; however, the court made no particular mention of the law and the facts in-

struction. Our supreme court ultimately found reversible error. Although the court stated that the error here was not as egregious as the instruction in *Parker,* the court held that the trial court should have re-read the guilt phase preliminary instruction during the habitual offender phase. *Id.* at 836–37.

■ In the case before us, we clearly are not faced with an instruction that impermissibly impinges upon the jury's role under Article I, § 19. To the contrary, Hancock's proposed instruction informs the jury of their power to nullify and is a correct statement of the law under Article I, § 19 of the Indiana Constitution. However, after a careful review of the record, we find that the tendered instruction was adequately covered by other instructions given by the court. The court's instruction number 1.03 was virtually identical to the instruction given in *Parker.* Specifically, the jury was instructed as follows:

> Under the Constitution of Indiana, the jury is given the right to decide both the law and the facts. In fulfilling this duty, you are to apply the law as you actually find it and you are not to disregard it for any reason. The instructions of the court are your best source in determining what the law is.

(R. 107). The jury was also instructed that it was the judge of the law and the facts. Specifically, the court's instruction 1.04 provided as follows:

> You are the exclusive and sole judges of what facts have been proven and you may also determine the law for yourselves. This statement does not mean that you have the right to disregard the law or to set it aside and make your own law. You should determine the law as it is enacted by the legislature of this State and considered and interpreted by the higher courts of record, and in that way you have the right to determine the law for yourselves, but not to make your own laws.

(R. 151). Instruction 1.04 was also given as a preliminary and final instruction dur-

ing the habitual phase of Hancock's trial. In both *Parker* and *Warren,* the courts stressed the importance of re-reading the law and facts instruction during the habitual offender phase. 698 N.E.2d 737; 725 N.E.2d 828. Here, any error in refusing Hancock's tendered instruction was cured by the trial court's reading and re-reading of instruction 1.04 during the habitual offender phase of the trial. We find no error.

## II. Prosecutorial Misconduct

### A. Standard of Review

■■■ In evaluating a properly preserved claim of prosecutorial misconduct, we first determine whether the prosecutor engaged in misconduct and then whether under all of the circumstances the prosecutor's misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Wright v. State,* 690 N.E.2d 1098, 1110 (Ind.1997). Whether or not the prosecutor has placed the defendant in a position of grave peril is measured by the probable persuasive effect of any misconduct on the jury's decision, and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant. *Id.* at 1111.

■■■ Persuasiveness on the jury's decision is relevant because the central issue is whether a prosecutor's comment has prejudiced the jury. *Moore v. State,* 669 N.E.2d 733, 740 (Ind.1996). Similarly, extensive or repetitive comments are generally more serious than a single, isolated statement. *Id.* In addition to the persuasiveness of a comment, a court should also consider the strength of the State's case. *Id.*

### B. Analysis

Hancock contends that comments made by the prosecutor during closing argument were so prejudicial that he was denied a fair trial. Specifically, he argues that the deputy prosecutor's comments amounted to a statement on Hancock's failure to testify in his own behalf.

■■■ At the close of the State's case-in-chief, Hancock and his co-defendant rested without presenting evidence. During the State's rebuttal closing argument, the deputy prosecuting attorney commented as follows:

I asked you to remember the evidence and when there's argument about things which there was no evidence then you should take that into consideration. There was no evidence about two other guys doing a burglary. The fact that the burglary charge has been dropped out is simply because there's no fingerprints or anything that puts these defendants at the burglary scene. There's no fingerprints that were collected at all and under the law if you merely have possession of the stolen goods right after the burglary occurred and nothing more, that's not enough to take the case to the jury, and that's why you haven't been given that part of it. It didn't say that they didn't do the burglary. But, the evidence the police provided to you wasn't enough to get it to you for your consideration. We hear all this story about these two other guys who did the burglary, but there was no evidence about two other guys that did the burglary. And there's this story about (sic) that Mr. Antalis is talking about that they bought it from these two other guys. There was no evidence about — you know, where are those other two guys. If anybody could bring them forth — I mean, they weren't brought forth for you. So, you should consider the evidence that you've been brought and not just mere speculation about all the things that could have happened.

(R. 405–06). Hancock did not object to the above comments, nor did he request that the jury be admonished. Having failed to object, request an admonishment, or move for a mistrial, Hancock has waived his right to review of the prosecutor's comments. *See Wright,* 690 N.E.2d at 1111 (To preserve an issue regarding the pro-

priety of a closing argument for appeal, a defendant must do more than simply make a prompt objection to the argument. Defendant must also request an admonishment, and if further relief is desired, defendant must move for a mistrial.).

 Hancock concedes that he made no contemporaneous objection at the time these comments were made; however, he argues that reversible error nonetheless exists because the comments amount to fundamental error. For prosecutorial misconduct to be fundamental error, it must be demonstrated that the prosecutor's conduct subjected the defendant to grave peril and had a probable persuasive effect on the jury's decision. *Channell v. State*, 658 N.E.2d 925, 931 (Ind.Ct. App.1995). Fundamental error is error that, if not corrected, would deny a defendant fundamental due process. *Moreland v. State*, 701 N.E.2d 288, 294 (Ind.Ct.App. 1998). However, notwithstanding waiver, a reversal based on prosecutorial misconduct is not warranted.

 The Fifth Amendment privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from the defendant's silence. *Moreland*, 701 N.E.2d at 293. However, [t]he Indiana Supreme Court has indicated that if in its totality the prosecutor's comment is addressed to other evidence rather than the defendant's failure to testify, it is not grounds for reversal. *Id.* (quoting *Channell*, 658 N.E.2d at 932). Specifically, in *Moreland*, the prosecutor commented that the evidence was unrefuted. We upheld that language stating that the prosecutor's comment focused on the totality of the evidence, and not on Moreland's failure to testify. *Id.* at 293–94. Hence, we held that the statement was not improper and did not constitute prosecutorial misconduct. *Id.* Similarly, in *Taylor v. State*, 677 N.E.2d 56 (Ind.Ct.App.1997), we rejected a challenge to the prosecutor's comment that the evidence [was] uncontroverted,

there's no evidence before you to the contrary.... *Id.* at 60. We held that this comment was clearly a comment on the evidence as a whole. It is general enough not to constitute an impermissible reference to [the defendant's] failure to testify. *Id.* at 61.

The comments made in this case are similar to those upheld in *Moreland* and *Taylor*. 701 N.E.2d 288; 677 N.E.2d 56. The prosecutor made no direct reference to Hancock's failure to testify. Nor do we believe that the prosecutor's comments were subject to a reasonable interpretation by the jury as inviting an adverse inference from Hancock's silence. More pointedly, the State merely commented on the lack of evidence presented by the defense to contradict the State's case. Although Klinger's testimony alluded to four men coming to her apartment on the night of the burglary, the defense presented no direct evidence to bolster its theory that someone other than Hancock committed the crimes. Under these circumstances, we do not see the prosecuting attorney's statements as an inappropriate comment on Hancock's failure to testify. Rather, the deputy prosecuting attorney was merely commenting on the defendant's failure to present convincing evidence to support his defense.

### Conclusion

The trial court properly refused Hancock's tendered jury instruction, as the substance of the instruction was covered in the court's instructions. Furthermore, the prosecutor's statements during closing argument did not amount to an unconstitutional comment on the defendant's failure to testify and therefore we do not find prosecutorial misconduct.

The trial court is affirmed in all respects.

SULLIVAN, J., and VAIDIK, J., concur.